UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YELLOW PAGES PHOTOS, INC.,

        **Plaintiff,**

vs.                                              **CASE NO.: 8:10-cv-436-VMC-EAJ**

**USER-FRIENDLY PHONE BOOK,
LLC and ASEC GROUP LLC,**

        **Defendants.**

_____/

## PLAINTIFF YELLOW PAGES PHOTOS, INC.'S
## MOTION FOR SANCTIONS AGAINST ASEC GROUP, LLC

      Yellow Pages Photos, Inc. ("Yellow Pages"), by and through its attorneys and

pursuant to Federal Rule of Civil Procedure 37(b)(2) and the inherent authority of the Court,

moves for sanctions against ASEC Group, LLC ("ASEC"), and in support states as follows:

### I.     INTRODUCTION

      This is an infringement action involving the unauthorized copying, use, and

distribution of Yellow Pages' copyrighted photographic images.[1]  At this point, there is no

legitimate dispute that ASEC and User-Friendly Phone Book, LLC ("User-Friendly") have

infringed Yellow Pages' copyrights.[2]  There is also no legitimate dispute that ASEC never had

---

[1] A more detailed explanation of the factual background has been previously briefed. *See* Dkt. 63.

[2] Specifically, User-Friendly concedes in an affidavit attached to its Motion for Partial Summary Judgment that despite a contractual provision against allowing use of the images by non-employees or transferring the images to others, it "copied each and every image licensed by plaintiff to User-Friendly and provided a copy of each and every image, i.e. all of the 'Works' described in ¶¶ 15(a)-15(yyy) of plaintiff's Amended Complaint, to defendant ASEC Group, LLC ('ASEC,' then known as 'ASEC International') and/or its successor(s) in interest...," *see* Dkt. 35, Wilson Decl. at ¶ 5, thereby breaching and terminating its license.  Discovery in this case substantiates that in fact each and every image at issue in this matter is in ASEC's possession and many, if not all, images have been copied and used by ASEC in advertisements produced for and distributed to its customers, including customers other than User-Friendly.

a right to use Yellow Pages' images that were licensed to User-Friendly. Almost a year ago Yellow Pages served ASEC with discovery requests directed to damages and other issues, and despite extensive efforts to resolve this dispute and involvement by the Court ASEC persists in its recalcitrance. While this motion will involve a discussion of technical computer related terms and electronically stored information, ASEC's discovery abuses are easily distilled – ASEC has refused to comply with its discovery obligations, ASEC has concealed evidence, ASEC has destroyed evidence, ASEC has altered evidence, and ASEC has refused to obey this Court's order to provide the requested discovery.

Specifically, ASEC has deleted, altered, and refused to produce information that bears on when User-Friendly transferred Yellow Pages' images to ASEC,[3] how often and for how many customers ASEC used the images, the profit ASEC illegally gained through use of the images, and the willfulness of ASEC's infringing activity. Despite the Court's admonishment and Yellow Pages' efforts to drag ASEC "kicking and screaming"[4] through the discovery process, ASEC continues to disregard its discovery obligations and treat the process as if it were a game not to be taken seriously.

Consistent with the purpose of Federal Rule of Civil Procedure 37(b), sanctions are appropriate at this juncture to both punish ASEC for its untoward conduct and to deter others tempted to engage in similar conduct. Yellow Pages respectfully requests the Court enter

---

[3] The transfer date is relevant to whether Yellow Pages is entitled to statutory damages under the Copyright Act. Although there is no dispute that User-Friendly transferred all of Yellow Pages' images to ASEC, which is all that is required to breach the terms of and automatically terminate the license, it appears that either ASEC or User-Friendly (or both) will raise an issue as to when the images were transferred and thus Yellow Pages' entitlement to statutory damages. Specifically, ASEC and User-Friendly will likely assert that Yellow Pages is not entitled to statutory damages based on an unsubstantiated claim that the images were transferred to ASEC, thus commencing the infringement, prior to the date of Yellow Pages' copyright registrations.

[4] At the January 27, 2011 hearing, the Court reminded ASEC and its counsel that "it's not the function of the Court or opposing counsel to drag a party kicking and screaming through discovery or other matters." *See* Dkt. 99, 34:21-35:3.

sanctions against ASEC, including the entry of default and/or an order drawing adverse inferences, and an order directing ASEC to pay Yellow Pages' reasonable costs, including attorneys' fees, incurred as a result of ASEC's discovery related misconduct.

## II.   BACKGROUND

ASEC was notified of this litigation by User-Friendly on February 18, 2010, prior to service of Yellow Pages' amended complaint on March 3, 2010. This triggered an affirmative duty to preserve relevant information, including electronically stored information ("ESI").[5] Within months after serving ASEC, Yellow Pages sent ASEC several discovery requests that sought production of electronic and paper copies of documents relating to the transfer, use, and distribution of photographic images belonging to Yellow Pages. Since then, ASEC has continuously flouted the letter and spirit of the discovery rules.

A review of ASEC's discovery conduct reveals that it is taking nearly every measure to avoid producing information in this lawsuit. First, at the inception of this litigation, ASEC took the position, which is now known to be false, that it was impossible to search for and locate all electronic files that contain any images owned by Yellow Pages, including advertisements containing the images, and refused to produce image or advertisement files. Second, ASEC's counsel (George Lee)[6] stated during a December 1, 2010 phone conversation that ASEC deleted the files containing Yellow Pages' images. Third, after Yellow Pages filed an emergency preservation motion, Mr. Lee recanted and ASEC produced, pursuant to the Court's order, a corporate representative (Del Snyder) who testified the files had not been deleted, but rather moved to a secure server and taken out of production to prevent further

---

[5] A true and correct copy of the litigation hold letter served with the amended complaint is attached hereto as Exhibit 1.
[6] Mr. Lee has been replaced as counsel for ASEC. *See* Dkt. 91.

use.  Fourth, in response to the Court's order directing ASEC to produce forensic images of any files containing Yellow Pages' images and copies of all advertisements ASEC created since the beginning of 2006, ASEC produced 12 hard drives, which upon examination exhibited clear evidence of altered and deleted data.  Finally, ASEC produced file listings that show that many electronic files containing images and advertisements were not produced pursuant to the Court's order and that, contrary to Mr. Snyder's testimony, ASEC has not taken the files out of production and is continuing to use, alter, and even delete files containing Yellow Pages' images.  In sum, the irregularities in the ESI can be categorized as: (1) alteration of metadata; (2) deletion of directly relevant files from the production drives; (3) operation of a data wiping program on the production drives; and (4) deletion of directly relevant files from ASEC's servers during this litigation, including within the past few months.

**A. ASEC's initial responses to written discovery indicated it was not possible to search for the images and advertisements containing them.**

Nearly a year ago, Yellow Pages served on ASEC pointed discovery requests to obtain any documents and electronic files related to Yellow Pages' copyrighted photographic images. ASEC responded that is was not "practicable" to locate Yellow Pages' images and advertisements containing them and, accordingly, refused to produce documents or electronic files.  See Exhibit 2, ASEC's Responses to Yellow Pages' First Request for Production Nos. 7, 8, 9, and 13; Exhibit 3, ASEC's Responses to Yellow Pages' Second Request for Production Nos. 1, 2, and 3; and Exhibit 4, ASEC's Responses to Yellow Pages' First and Second Sets of Interrogatories Nos. 10 and 17.  A chart detailing the relevant discovery requests and responses is attached hereto as Exhibit 5.

Despite several attempts to educate the defendants about the methods by which responsive files could be located, ASEC repeatedly failed or refused to undertake a reasonable search for responsive documents and electronic files.   By way of example, as more fully discussed *infra* at § II.E., ASEC could have performed a simple keyword search (i.e., YPPI, Yellow Pages) across its entire system to locate the vast majority of responsive image files. Additionally, on September 28, 2010, Yellow Pages' counsel sent all defendants an email detailing several approaches to track a specific image to each advertisement in which the image was used.[7]   After reviewing the documents ASEC produced as of that date and discussing the matter with Yellow Pages' computer forensic expert (Adam D. Sharp), Yellow Pages detailed four different approaches that ASEC could employ to locate advertisements by beginning with the source files (where Yellow Pages' images were initially downloaded) and expanding the search to see where the images were eventually sent.   ASEC never responded in writing to Yellow Pages' proposed methodology.   Indeed, despite being ordered by the Court (Dkt. 73), ASEC has still not produced forensic images of thousands of files containing Yellow Pages' images or all advertisements produced for its customers since January 1, 2006.

**B.  ASEC informed Yellow Pages that its images were deleted.**

While Yellow Pages was working with ASEC to obtain the relevant discovery, on December 1, 2010, Mr. Lee informed the undersigned that "certain electronic files consisting of art images belonging to plaintiff Yellow Pages Photos, Inc. had been 'deleted' from defendant ASEC's servers."   *See* George Lee Affidavit (Dkt. 72, p. 13 at ¶ 3).   That representation and ASEC's failure to provide an explanation for two weeks thereafter,

---

[7] A true and correct copy of the September 28, 2010 email correspondence sent to User-Friendly's counsel, and copied to ASEC's counsel, is attached hereto as Exhibit 6.

coupled with ASEC's interrogatory answer that it had done nothing to preserve evidence, *see* Exhibit 4, Response to Interrogatory No. 18, prompted Yellow Pages to file its Emergency Motion to Compel and for Entry of a Preservation Order ("Emergency Motion"). *See* Dkt. 63. The Court promptly entered an order (the "Initial Order") directing ASEC to: (1) immediately implement a litigation hold; (2) produce a corporate representative for a deposition related to the issue of spoliation of evidence; and (3) appear at a hearing on December 30, 2010 to address the remaining relief requested. *See* Dkt. 64.

### C. ASEC provided sworn testimony that Yellow Pages' images were not deleted, but rather relocated to a "secure" server and taken out of production.

ASEC produced for deposition its Executive Vice President of Operations, Delbert Wayne Snyder, Jr., to discuss the spoliation issues. Mr. Snyder testified that in fact the images were not deleted, as originally represented, but instead that after being informed by User-Friendly's counsel on February 18, 2010 of pending copyright infringement litigation regarding Yellow Pages' images, he ordered the personnel at the ASEC Philippines and India locations to "move these images out of production and put them in a secure server." *See* Exhibit 7, Del Snyder Deposition Transcript ("Snyder Dep. Tr."), at 99:14-17; *see also* 98:6-12; 112:6-20; 132:4-12; 137:18-25.

That testimony is entirely inconsistent with ASEC's sworn interrogatory answer six months earlier that it was not "practicable" for ASEC to locate electronic files containing Yellow Pages' images. Assuming these files were in fact moved to a secure location some time in February or March of 2010, which Mr. Snyder testified took place at his direction,[8] ASEC had

---

[8] Surprisingly, when initially asked how ASEC was able to identify Yellow Pages' photographic images for migration to a "secure" server, Mr. Snyder had no more than a general recollection that he sent personnel in India and the Philippines a list of images, but he could not describe how that list was generated, despite

in fact located and could have produced, at a minimum, those files. *See id.* at 120:11-17.

Indeed, Mr. Snyder testified that the files containing Yellow Pages' images were moved to two

locations. *See id.* at 127:6-24. Notably, Mr. Snyder also testified that he can personally delete

files from ASEC's system, and he has "a personal login that allows [him] fairly unlimited

access."[9] *See id.* at 96:24-97:2. Given Mr. Snyder's testimony that the electronic files were

not deleted, but rather moved to a "secure" location, Yellow Pages requested an order from

the Court requiring ASEC to produce the ESI.

### D. Pursuant to the Court's Discovery Order, ASEC produced 12 hard drives that contain evidence of altered metadata and deleted files.

Following the hearing on December 30, 2010, the Court entered a further order (the

"Discovery Order") directing ASEC to produce: (1) a forensic copy image of all Yellow Pages'

image files in its possession, including associated metadata,[10] and (2) copies of all

advertisements generated since January 1, 2006.[11] *See* (Dkt. 73). ASEC's production contains

evidence of intentional alteration by ASEC prior to delivery to Yellow Pages.

All of the information produced by ASEC pursuant to the Discovery Order was produced

in the form of an electronic file, or ESI. Although electronic files generally contain a significant

amount of metadata (both internal and external), for the purposes of this motion the metadata

---

admitting that he generated the list himself. *See* Snyder Dep. Tr. at 101:10-16-21. Later on during the deposition, Mr. Snyder admits that ASEC was able in February 2010 to identify those images belonging to Yellow Pages because the images' file names contain nomenclature that is unique to Yellow Pages. *Id.* at 120:18-23. This is merely one example of the curiously inconsistent testimony provided to Yellow Pages during the discovery process.

[9] It is not surprising that Mr. Snyder has such a high level of access to the servers located overseas and operated by the two foreign non-parties. Mr. Snyder testified during his limited 30(b)(6) deposition that he and Evan Green (CEO of ASEC) personally own ASEC India and sit on its board of directors. *See id.* at 56:18-57:7.

[10] Specifically, the Court ordered ASEC to "produce a forensic image of <u>any of Plaintiff's image files</u> in ASEC's possession, including any associated metadata." (Dkt. 73) (emphasis added).

[11] Specifically, the Court ordered ASEC to "produce copies of all advertisements it generated during the relevant period." (Dkt. 73).

about which Yellow Pages is most concerned is the external metadata that reflects important dates associated with the files. Specifically, electronic files generally have four dates/times associated with them: (1) a "file created" date/time, which is when a file was created on the drive where it is found; (2) a "last written" date/time, which is when a file's contents were last modified; (3) an "entry modified" date/time, which is when a file folder was last modified; and (4) a "last accessed" date/time, which is when a file was last accessed in any way. *See* Exhibit A to Exhibit 8, ¶ 9. The "file created" date for the source files of Yellow Pages' images is particularly important as it would be expected to identify the date on which ASEC copied the image files to its server and began its infringing conduct, which goes directly to the heart of the dispute regarding whether Yellow Pages is entitled to statutory damages.

ASEC produced a total of twelve drives to Yellow Pages pursuant to the Discovery Order, some of which were initially inoperable, but could be restored, and one which was inoperable and had to be redelivered on a new drive. Prior to the hearing on January 27, 2011, Mr. Sharp had reviewed and analyzed six[12] of the drives and reached the conclusion that the files on them had been tampered with prior to being produced. The six additional drives produced just prior to and after the January 27, 2011 hearing did nothing to allay Yellow Pages' concerns and indeed contained additional evidence of tampering, albeit using different tactics in an effort to avoid detection.[13] There are three broadly defined types of irregularities in

---

[12] Throughout this motion, these drives will be referred to as "Drive 1," "Drive 2," "Drive 3," "Drive 4," "Drive 5," and "Drive 6," each of which will correspond respectively with the labels ascribed to them in the Sharp Declaration attached as Exhibit A to Exhibit 8.

[13] As Mr. Sharp explains in his most recent Declaration, instead of wiping using random character filenames, wiping occurred on the second set of hard drives using zeroes and empty filenames. *See* Sharp Declaration, Exhibit 9, at ¶ 17, which will also need to be filed under seal due to ASEC's designation of information contained therein as "Highly Confidential." Normally when a file is deleted, the remnant of the data from that file can be seen using certain tools, unless it is overwritten by a new file. *Id.* When the remnant data contains all zeroes, this indicates that a "wiping" tool has been used. *Id.* In addition, Mr. Sharp found that the actual Recycle

the hard drives Mr. Sharp analyzed: (1) alteration of external metadata associated with the files on the hard drives; (2) evidence of files having been deleted from the hard drives; and (3) evidence of wiping programs having been used on the hard drives.

First, the drives contained irregular and clearly manipulated dates. Mr. Sharp was able to view the external metadata and determine when each of the drives was formatted and prepared for the data transfer. Because the Discovery Order was entered on December 30, 2010, it is fair to start with the assumption that each drive should reflect an initial formatting date after December 30, 2010. Specifically, Drives 1, 4, and 5 contained date and time entries that were clearly manipulated prior to being produced. *See* Exhibit A to Exhibit 8, at ¶¶ 10, 56, 68. Drive 1 reflects that the drive was formatted and prepared for data transfer on January 3, 2010 at 7:15 a.m. – nearly a year before the Court entered the Discovery Order. *Id.* at ¶ 12. Drive 1 further reflects that the program used to create the forensic images (i.e., FTK Imager Lite 2.9.0)[14] was loaded on to the drive on January 3, 2010 at 7:16 a.m. *Id.* at ¶ 13. This is impossible because FTK Imager Lite 2.9.0 was not released until after April 6, 2010. *Id.* at ¶ 13. Drive 4 indicates it was formatted for use on February 18, 2010 at 2:56 a.m., almost ten and a half months before the Discovery Order. *Id.* at ¶ 55. This is likewise impossible because the drive was not even manufactured until August 5, 2010. *Id.* at ¶ 54. Drive 5 indicated it was formatted for use on February 18, 2010 at 5:38 a.m., which is also impossible

---

Bin folders on the drives had been deleted, and that System Restore Points on the drives had also been deleted. *Id.* At no point would the Recycle Bin or System Restore Points folder be deleted without deliberate action. *Id.* It is likely that ASEC attempted to further hide some of its conduct, because on January 27, 2010, Yellow Pages' provided to ASEC Mr. Sharp's declaration spelling out the irregularities he observed and what caused the irregularities in Drives 1-6. *See* Exhibit 8.

[14] On December 30, 2010, Mr. Sharp sent an email to the parties, providing detailed instructions on the use of the Access Data FTK Imager software, as well as a link from which to download the software. *Id.* at ¶ 87. The FTK imager software will capture data in a forensic file format commonly used in the computer forensic industry.

because the drive was likewise manufactured on August 5, 2010. *Id.* at ¶¶ 65, 66. These date discrepancies are obviously suspicious.

A comparison of the external metadata from an exemplar photographic image file contained on Drive 1, however, provides the clearest example of evidence tampering. Drive 1 contained two different sets of identical files, but in two different formats, one a set of forensic image files made using the FTK Imager program (the "Drive 1 Forensic Files") and the other a set of the same files copied without using the FTK Imager program (the "Drive 1 Server Files"). *Id.* at ¶ 11. By way of example, Mr. Sharp compared the external metadata from one of Yellow Pages' image files, HOM-B0150.jpg (the "150 Image"), as it existed on three different media: (1) an original from Yellow Pages' server; (2) from the Drive 1 Server Files, and (3) from the Drive 1 Forensic Files. Exhibit B to Mr. Sharp's January 26, 2011 Declaration displays the comparative analysis of the three files and associated metadata in a table format. *Id.* at Exhibit B.

The "last written" date is the date on which the contents of the file were last modified, i.e., the final editing of the photograph by Yellow Pages prior to its distribution to licensees, and should always remain the same even when copied from one location to another. *Id.* at ¶ 18. The date Yellow Pages last edited the 150 Image was May 29, 2003, as reflected in the table on Exhibit B in the "last written" column in the first row. *Id.* at ¶ 18, Exhibit B. By contrast, the "last written" dates for the 150 Image located in the Drive 1 Server Files and the Drive 1 Forensic Files are January 3, 2010 and February 17, 2010, respectively. *Id.* at ¶¶ 19, 21. The "last written" dates from the two files produced by ASEC would be expected to be identical to the forensic image taken from Yellow Pages' server, but at the very least could

not be two entirely different dates. *Id.* at ¶ 19. Moreover, there is no legitimate situation in which an "entry modified" date is earlier than a "file created" date, as is the case with the copy of the 150 Image from the Drive 1 Forensic Files, because the "entry modified" date does not exist until the file is first copied to the hard drive, the act creating the "file created" date. *Id.* at ¶ 19. Either the "file created" and "entry modified" dates must be the same or the latter must be later than the former. *Id.* In this case the "file created" date is later than the "entry modified" date in the Drive 1 Forensic Files, which is not naturally possible. *Id.* at ¶ 19. In Mr. Sharp's expert opinion, the discrepancies in the "last written," "file created," and "entry modified" dates were caused by tampering with the clock for the workstation used to download the files. *See id.* at ¶¶ 20, 25, 26.

Second, there is evidence of deletion from the hard drives after the drives were formatted and prepared for data transfer. Mr. Sharp concluded that files were deleted because the hard drives contained a "recycle bin," which will not ordinarily exist on a newly formatted hard drive unless files have been deleted from the drive. *Id.* at ¶¶ 27, 36, 46, 59, 70, 83. There were "recycle bins" located on Drives 1, 2, and 5, but they were empty, and the deleted files could not be recovered due to the use of wiping software. *Id.* at ¶¶ 27, 36, 70. Drives 3, 4, and 6 also contained two "recycle bins" each,[15] only one of which on each drive was emptied. *Id.* at ¶¶ 46, 47, 59, 60, 83, 84. Notably, ASEC intentionally deleted, but did not

---

[15] There is a rational explanation for the existence of two "recycle bins" on some drives, and only one on the others. The Windows Operating System, in normal operation, creates a restore point that is unique to each workstation to which a hard drive is connected. *Id.* at ¶ 22. This restore point collects information regarding changes that are made to the drive. *Id.* Drives 3, 4, and 6 each had two restore points, indicating that the drives were connected to two different computers after the drives were formatted and prepared for data transfer. *Id.* at ¶¶ 44, 58, 80. Interestingly, the workstation identifiers in the restore points are unique to a particular computer, and Mr. Sharp's review of the drives revealed that one workstation (referred to in his declaration as the "C19 Workstation") accessed each drive, created a "recycle bin" each time, and always deleted the files in the "recycle bin." *Id.* at ¶¶ 29, 35, 36, 46, 59, 71, 83. The user at the other workstations, ostensibly in a different location, was not as careful and deleted certain files, but did not empty the "recycle bin."

empty from the "recycle bin," several thousand advertisements and photographs, many of which contained Yellow Pages' images. *Id.* at ¶ 47, Exhibit C.   Mr. Sharp also observed that ASEC deleted a program known as VNC, an application that allows a user to remotely control a computer over a network. *Id.* at ¶ 60.

Third, 5 of the 6 hard drives Mr. Sharp initially analyzed contained evidence that ASEC ran a program that renders unrecoverable any electronic files copied to a hard drive and subsequently deleted ("Wiping Program"). *Id.* at ¶¶ 28, 37, 61, 73, 85.   Any argument that the Wiping Program was run prior to the transfer of relevant data by ASEC is belied by the run dates of the program on the drives. *Id.* at ¶¶ 28 (Drive 1 – 1/6/11), 37 (Drive 2 – 1/9/11), 61 (Drive 4 – 1/15/11), 73 (Drive 5 - 1/15/11), 85 (Drive 6 - 1/19/11).   ASEC's counsel sent Yellow Pages a chart of the hard drive tracking information, which shows that the first Drives 1 and 2 were shipped from the overseas facilities on January 3 and 4, 2011, respectively, and they arrived in South Carolina on January 6, 2011, which is the first date the Wiping Program was run. *See* Exhibit B to Exhibit 8.   Mr. Sharp was able to determine that ASEC deleted and rendered unrecoverable[16] 13,332 items from the hard drives. *See* Exhibit A to Exhibit 8, at ¶¶ 30, 38, 62, 74, 86.   In the only drive that ASEC did not wipe (i.e., Drive 3), Mr. Sharp was able to recover some of the files. *Id.* at ¶ 49.   Not surprisingly, all of the file names begin

---

[16] The Wiping Program effectively scrambles and replaces characters in the deleted file names and files. Specifically, the wiping process scrambled all deleted file names, filling them with random characters, deleted all date/time markers, overwrote the deleted files with random characters, set the size of the original files to zeros, and reset only the "entry modified" date/time to the current date at the time of the procedure. *See* Exhibit A to Exhibit 8, at ¶¶ 30, 38, 62, 74, 86.

with the word "Spec"[17] and some of the recoverable images contained the name "The User Friendly Phone Book." *Id.* at ¶ 49.

The files ASEC produced raise serious questions about the reliability of the data contained therein and ASEC's conduct in preparing and delivering the data. Indeed, the data provided in the forensic copies serves no evidentiary value as Yellow Pages' images are already in the possession of Yellow Pages, metadata relating to the images produced has been altered, and all evidence of the original location of these images as used by ASEC has been removed or lost. *Id.* at ¶ 90.

Yellow Pages initially requested the Court order ASEC to retain an expert to perform an appropriate search for files containing Yellow Pages' images. *See* Dkt. 63. Although the Court did not require this, Yellow Pages' expert offered to assist in the process and even provided instructions to ASEC. Exhibit A to Exhibit 8, at ¶ 90. Rather than allow outside involvement, ASEC took it on itself to attempt to comply with the Discovery Order. Accordingly, at the January 27, 2011 discovery status hearing, Yellow Pages again raised its concerns, and ASEC agreed to work with Yellow Pages and submit to the Court a joint stipulation to address these and other remaining issues related to the Emergency Motion. *See* Dkt. 84. The parties stipulated to the production by ASEC of active directory and file listings from ASEC's ad production servers. *See* Dkt. 93. The idea was to procure a baseline against which to assess ASEC's compliance with the Discovery Order. On February 18, 2011, the Court approved and adopted the parties' stipulation as the Court's Order ("Adopted Discovery Order"). *See* Dkt. 94.

---

[17] The word "Spec" is often used in this industry, as reflected in Exhibit "D" to Mr. Sharp's declaration, as the nomenclature for advertisements prepared by artists as a draft or template for a prospective sale that may not necessarily be published. *See* Exhibit A to Exhibit 8, at Exhibit D.

**E. The file listings produced pursuant to the Adopted Discovery Order indicate that existing files have not been produced and relevant data has been destroyed.**

Mr. Sharp examined the file listings[18] from all eighteen of ASEC's ad production servers ("File Listings"),[19] and his review of the active directory and file listings confirmed what Yellow Pages suspected after reviewing Drives 1-12 – that ASEC failed to comply with the Discovery Order and engaged in spoliation by intentionally deleting relevant files and associated metadata.    The File Listings show that: (1) thousands of electronic files containing Yellow Pages' images have not been produced; (2) ASEC deleted numerous relevant electronic files, in some cases after the Discovery Order; (3) ASEC intentionally altered the metadata associated with several thousand electronic files; and (4) ASEC installed a program on a server for the singular purpose of permanently wiping and destroying data.  Each will be discussed in turn.

First, Mr. Sharp observed that partial or complete libraries of Yellow Pages' images are on at least <u>twelve</u> different ad production servers.  *See* Exhibit 9, at ¶ 26.  However, in the twelve hard drives produced by ASEC, there are only two sets of forensically captured Yellow Pages image libraries. *Id.* at ¶ 27.  One set is believed to be from a server located at ASEC India and the other is believed to be from a server located at ASEC Asia.  *Id.*  Although Mr. Sharp could not trace the forensically captured images to their source location because ASEC accessed, moved, and/or renamed the files after the forensic imaging was done, the two

---

[18] The File Listings are not the electronic files themselves.  Rather, a file listing is a computer generated list of all files, folders, and certain external metadata located on a given server or computer.  Specifically, as shown in Exhibit C to the April 14, 2011 Sharp Declaration, the file listing lists: the filename; the full path of the file; the size of the file; the external metadata showing the date the file was created, modified, and last accessed; and whether the file has been deleted from the server/computer.  *See* Exhibit 9, at Exhibit C.

sets of forensically captured images must have necessarily come from a server that has a ███████████████████ which could only be traced to four of the eighteen servers. *Id.* at ¶ 28. That leaves ten partial or complete libraries of electronic files containing Yellow Pages' images that were not produced to Yellow Pages pursuant to the Court's Order. *Id.* Interestingly, at least two of the sets of files never produced contain "YPPI Images" in the file name. *Id.* at ¶ 29. ASEC has still not produced those image files.

Second, ASEC deleted relevant electronic files, in some cases after the Court's Discovery Order. Mr. Sharp noted that ASEC deleted several thousand electronic files containing Yellow Pages' images from eight different servers. *Id.* at ¶¶ 20, 30. For example, on the ████████ server, ASEC deleted both advertisements and images on or after February 2, 2011, which was the last time the system updated the external metadata relating to those deleted files. *Id.* at ¶ 31. Additionally, ASEC deleted the entire Yellow Pages "Limousine collection" from its ████████ server on February 25, 2011, nearly two months after the Court entered its Discovery Order. *Id.* Finally, the File Listings show that ASEC created what appears to be a library containing Yellow Pages' images in December 2007, but deleted the library at some time on or after November 5, 2010. *Id.* at ¶ 34. Third, as suspected, ASEC altered the metadata of several of the electronic files. *Id.* at ¶ 23. Finally, during the process of downloading the File Listings with D4 Discovery, Mr. Sharp noticed an icon on the desktop of one of the servers named "Delete Files Permanently," located in the Asecindia file listing provided by ASEC. *Id.* at ¶ 21. This is a commonly available program used for the singular purpose of permanently wiping and destroying data, and could be used to accomplish the type of wiping pattern Mr. Sharp previously found on the ASEC production

hard drives. *Id.* The File Listing indicates that this program was installed and in use on the Asecindia server since January 12, 2011. *Id.*

Mr. Sharp's ultimate conclusion was that this entire exercise was a waste. ASEC could have performed a simple search across ASEC's system to locate files that contain Yellow Pages' images. *Id.* at ¶ 38. In the type of IT environment used at ASEC India and ASEC Asia, as revealed by the File Listings and as described by Mr. Snyder, Mr. Sharp opined that it was possible to create a simple set of instructions to run on the network, known as a "script." *Id.* The script could search through all computers and servers and collect the filename and location of many, if not all, of Yellow Pages' images.[20] *Id.*

### III.   ARGUMENT

There exist two separate bases to impose sanctions against ASEC. First, the Court should enter sanctions against ASEC for failing to comply with the Court's December 30, 2010 Discovery Order. Second, additional sanctions are appropriate due to ASEC's spoliation of relevant evidence during the course of this litigation.

### A.   The Court should enter sanctions against ASEC for its failure to comply with the December 30, 2010 Discovery Order.

The Discovery Order unambiguously ordered ASEC to produce: (1) a forensic image of any of Yellow Pages' image files in ASEC's possession, including associated metadata, and (2) copies of all advertisements generated since January 1, 2006. *See* Dkt. 73. After receiving an extension, ASEC produced Drives 1-6, and later Drives 7-12 (after being alerted to the evidence

---

[20] In fact, Mr. Sharp examined the File Listings produced by ASEC and performed a simple search of filenames using the term "-a0," which is a sequence of characters common to most of the images in Yellow Pages' Collection. *Id.* at ¶ 39. This does not account for files which may have been renamed by ASEC, nor files in which Yellow Pages' images are embedded such as completed advertisements. *Id.* at ¶ 39. In addition, Mr. Sharp found several unproduced iterations of the Yellow Pages' library on ASEC's servers which used the name "YPPI Library." *Id.* at ¶ 39.

of manipulated data).  Despite hundreds of hours spent by Yellow Pages' counsel and expert attempting to piece together what was provided, ASEC has still failed to comply with the Discovery Order.

Specifically, there are at least ten partial or complete libraries of thousands of electronic files containing Yellow Pages' images not produced to Yellow Pages.  Exhibit 9, at ¶ 28.  At least two of the libraries contain images belonging to Yellow Pages that were never licensed to User-Friendly and, consequently, Yellow Pages was not aware were in ASEC's possession.  *Id.* at ¶ 29.  Additionally, ASEC deleted files containing Yellow Pages' images from eight servers.  *Id.* at ¶ 30.  Notably, on February 25, 2011, ASEC deleted the entire Yellow Pages' "Limousine" collection (which is at issue in this case) from its ██████server.  *Id.* at ¶ 31.  There is also evidence that ASEC deleted advertisements and images on or after February 2, 2011.  *Id.* at ¶ 31.  Most importantly, Mr. Sharp observed that there once existed evidence that possibly the Yellow Pages' library was first copied to ASEC's server in December 2007, but ASEC deleted the library at some time on or after November 5, 2010.  *Id.* at ¶ 34.  The most critical evidence relating to whether Yellow Pages is entitled to statutory damages under the Copyright Act was not produced pursuant to the Discovery Order and was intentionally deleted by ASEC so that it now no longer exists.  Accordingly, the Court should enter a default judgment against ASEC as a sanction pursuant to Rule 37.

The Court has broad discretion to sanction a party that fails to obey a discovery order.  *See* Rule 37(b)(2)(A), Fed. R. Civ. P.; *see, e.g., Malautea v. Suziki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993).  "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who

might be tempted to such conduct in the absence of such a deterrent." *Pandora Jewelry, LLC v. Cappola Capital Corp.*, 2009 WL 790129, at *3 (M.D. Fla. Mar. 23, 2009) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 755 (1980)). Sanctions may be granted when a party fails to comply with a court order even when there is a lack of willfulness or bad faith. *U & I Corp. v. Advanced Medical Design, Inc.*, 251 F.R.D. 667, 674 (M.D. Fla. 2008).

When a party's discovery conduct is recalcitrant or in willful disregard of the discovery process, however, the district court has broad discretion to impose more severe sanctions such as the striking of a pleading or entry of default. *See, e.g., Quinn v. Island Fitness, Inc.*, 2009 WL 464978, at *2 (M.D. Fla. Feb. 24, 2009). A district court need not explicitly warn a party that its failure to comply with a discovery order could result in the entry of a default judgment so long as it has adequate notice of the consequences of its conduct. *See Marcelle v. American Nat'l Delivery, Inc.*, 2010 WL 1655537, at *4 n. 6 (M.D. Fla. Apr. 23, 2010). The district court should exercise its judgment to enter a default judgment when: (1) a party's failure to comply with a court order is a result of willfulness or bad faith; and (2) the district court finds that lesser sanctions would not suffice. *Shortz v. City of Tuskegee*, 352 Fed. App'x 355, 358 (11th Cir. 2009). Rule 37(b)(2)(C) states that the Court must, instead of or in addition to other sanctions, order the party disobeying a court order to pay the attorneys' fees and costs of the moving party unless the failure to comply was substantially justified.

The willfulness of ASEC's failure to comply with the Discovery Order is readily apparent from its conduct leading up to and since Yellow Pages filed its Emergency Motion. When asked for documents or electronic files relating to Yellow Pages' images and

advertisements containing Yellow Pages' images, ASEC responded it was not "practicable" to do so. *See* Exhibit 2, Nos. 7, 8, 9 and 13; Exhibit 3, No. 1, 2, and 3; and Exhibit 4, Nos. 10 and 17. In its June 30, 2010 responses, ASEC never mentioned the alleged file "migration" that took place in February of 2010 when User-Friendly warned ASEC about this litigation. Rather, ASEC waited until Yellow Pages filed its Emergency Motion and Mr. Snyder finally testified that he ordered ASEC India and ASEC Asia to "move these images out of production and put them in a secure server." *See* Exhibit 7, at 99:14-17. Mr. Snyder's testimony that he could not be sure how he generated the "list" of files to migrate is not credible, and ASEC's failure to apprise Yellow Pages of the migration when initially requested is inexcusable. Coupled with the evidence of data tampering and file wiping, there can be no other conclusion than that ASEC's refusal to comply with the Discovery Order was willful. The willfulness of ASEC's non-compliance (and its infringing conduct) is further buttressed by the fact that ASEC's excuse for originally moving the images (i.e., to take them out of production) was not truthful, because the File Listings evidence that ASEC is continuing to use the images in newly created advertisements, as recently as February of 2011. *See* Exhibit 9, ¶ 33.

ASEC's blatant disregard for the discovery process and this Court's authority makes clear that no sanction short of a default will suffice. It is not uncommon for a court to enter a default judgment for the first violation of a discovery order when the conduct rises to the level of bad faith evidenced here. *See, e.g., U.S. v. One 32' Scorpion Go-Fast Vessel*, 339 Fed. App'x 903, 905-06 (11th Cir. 2009) (affirming dismissal by district court as a discovery sanction due to the willfulness of the conduct and the absence of a credible explanation for the non-compliance); *Marcelle*, 2010 WL 1655537, at *4 (entering default judgment against

defendant based on first violation of discovery order because the evidence portrayed a complete and willful disregard for its discovery obligations and the discovery order). As Magistrate Judge Jenkins noted during the last discovery status hearing on January 27, 2011, "it's not the function of the Court or opposing counsel to drag a party kicking and screaming through discovery or other matters." *See* Dkt. 99, 34:21-35:3. ASEC failed to heed the Court's express warning, fully aware that it could be forced to pay costs for failing to comply. As the Eleventh Circuit aptly stated, "Rule 37 does not require the vain gesture of first imposing those lesser sanctions." *Malautea*, 987 F.2d at 1544.

ASEC's conduct has also severely prejudiced Yellow Pages' ability to prove its case for statutory damages. *See, e.g., Fharmacy Records v. Nassar*, 379 Fed. App'x 522, 527 (6th Cir. 2010) (affirming dismissal as a discovery sanction and stating as a basis for the prejudice to the movant that the "right to rebut the plaintiff's allegations has meant little because the evidence has either been lost, tampered with, or irretrievably compromised"). The court also noted that a party need not be formally notified that "spoliation of evidence and misrepresentations may lead to dismissal." *Id.*

Accordingly, the Court should strike ASEC's answer, affirmative defenses and dismiss its counterclaim, which would result in a default judgment against ASEC, leaving only a determination of damages. Additionally, Yellow Pages requests the award of all attorneys' fees and costs since December 1, 2010 relating to the Emergency Motion and this Motion incurred as a result of ASEC's discovery related conduct.[21]

---

[21] As demonstrated by ASEC's recently filed Motion for Clarification of Court Order (Dkt. 117), ASEC now attempts to argue essentially that it should be excused from its sanctionable conduct because it is really its "foreign contractors" AsecAsia, Inc. and AG Resource India PVT Ltd. who are responsible, and ASEC has no "control" over these entities. Suffice it to say, ASEC's representation of these newly found excuses is inaccurate

**B.**     **The Court should enter sanctions against ASEC because ASEC deleted relevant evidence during the course of this litigation.**

Yellow Pages did not ask for sanctions when it filed its Emergency Motion, despite the representation that ASEC deleted certain electronic files containing Yellow Pages' images. *See* Dkt. 63. At that time, Yellow Pages was not privy to the full extent of the spoliation. At this stage, however, not only are sanctions warranted, they are necessary to preserve the integrity of the discovery process. The result of ASEC's conduct is two-fold: first, relevant data is now permanently deleted; second, there is no longer any confidence in the accuracy of information supplied by ASEC and its corporate officers, Mr. Green and Mr. Snyder. Accordingly, Yellow Pages respectfully requests the Court, in addition or in the alternative to the entry of a default judgment, draw two adverse inferences: (1) that ASEC began infringing the copyrights of each photographic image at issue in this case after registration of the copyrights in Yellow Pages' images at issue in this litigation; and (2) ASEC's infringement was willful. Yellow Pages also asks the Court to order ASEC to pay all attorneys' fees and costs incurred as a result of ASEC's conduct giving rise to this motion.

"[S]poliation is established when the party seeking sanctions proves that: (1) the evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant's prima facie case or defense." *Southeastern Mechanical Srvcs, Inc. v. Brody*, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009). Generally, evidence of bad faith or willfulness must be present before a district court can impose spoliation sanctions such as a default judgment or an adverse inference. *See, e.g., Flury v.*

---

and misleading. Yellow Pages will fully address the same in its Response to the Motion for Clarification of Court Order.

*Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (vacating district court order with instructions to enter judgment for the defendant due to spoliation). However, the party that caused the spoliation need not act with malice. *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. Sep. 28, 2009).

There is no dispute that the evidence existed at one time. In addition to the many electronic files located across ASEC's system, ASEC specifically deleted advertisements and images from its ███████ server on or after February 2, 2011, and ASEC deleted the entire Yellow Pages "Limousine collection" from its ████████ server on February 25, 2011. *See* Exhibit 9, at ¶ 31. In addition, ASEC deleted numerous relevant electronic files, in some cases after the Court's Discovery Order. *See id.* at ¶¶ 31, 34. Moreover, metadata that would show when the entire library was first copied on ASEC's servers is irretrievably lost due to ASEC's intentional alteration of the electronic files.

Likewise, there is no dispute that ASEC had a duty to preserve this evidence, dating back to February 18, 2010, when ASEC was notified by User-Friendly that there was a problem with Yellow Pages' images. At the latest, the duty was triggered when ASEC received the March 3, 2010 litigation hold letter with the amended complaint and actually knew the electronic files containing Yellow Pages' images would be relevant to the litigation. *See St. Cyr v. Flying J, Inc.*, 2007 WL 1716365, at * (M.D. Fla. June 12, 2007). Based on Mr. Sharp's testimony, the forensically captured images produced to Yellow Pages pursuant to the Discovery Order have no evidentiary value because many of the dates/times have been altered in such a way that they do not accurately represent any of the original file dates/times as would have been found had the metadata remained intact. *See* Exhibit 9 at ¶ 37. ASEC

deleted many of the electronic files (the ones of which Yellow Pages is aware) within the past few months. *See id.* at ¶ 31. Due to ASEC's destruction of evidence during the pendency of this litigation, after receiving several discovery requests related to the evidence, and after the Court entered the Discovery Order, there can be no reasonable dispute that ASEC destroyed the evidence while it had an affirmative duty to preserve it.

Nothing other than bad faith can be inferred from ASEC's conduct in this case. First, counsel for Yellow Pages served ASEC with a litigation hold letter along with the Amended Complaint on March 4, 2010. *See* Exhibit 1. Despite being served with a litigation hold letter by Yellow Pages, ASEC did not issue a formal litigation hold until after the Court ordered it to on December 17, 2010 – nearly ten (10) months after the inception of this litigation. *See* Dkt. 73. Perhaps the most egregious indicia of willfulness in this case is the intentional deletion of files and the use of a wiping program to prevent the deleted files from being recovered. *See, e.g., Philips Elect. North America Corp. v. BC Technical*, 2011 WL 677642, at *59 (D. Utah Feb. 16, 2011) (finding the use of wiping programs to overwrite deleted data inexcusable and evidence of bad faith spoliation); *In re Krause*, 367 B.R. 740, 749 (Bankr. D. Kan. 2007) (finding the intentional use of wiping software constituted the requisite evidence of bad faith for spoliation sanctions). In *Philips*, the court struck the offending party's answer, dismissed its counterclaim and entered a default judgment in favor of the moving party. 2011 WL 677642, at *62.

As a direct result of ASEC's intentional destruction of the relevant electronic files and associated metadata, some of which occurred after the Court entered the Discovery Order, Yellow Pages is unable to obtain information that is critical to its case. Specifically, Yellow

Pages is unable to determine the precise date that ASEC began infringing the copyrights in the images at issue, which is directly relevant to whether Yellow Pages is entitled to statutory damages under the Copyright Act. *See* 17 U.S.C. § 412. Moreover, Yellow Pages has no way of knowing what else the many deleted files might have shown or revealed. Accordingly, Yellow Pages respectfully requests the Court, in addition to the entry of a default judgment and award of fees and costs incurred as a result of ASEC's conduct, draw two adverse inferences: (1) that ASEC began infringing the copyrights in each photographic image at issue after registration of the copyrights in them; and (2) ASEC's infringement was willful.

Respectfully submitted,

/s/ Mindi M. Richter
J. Todd Timmerman, Esquire, Trial Counsel
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter, Esquire
Florida Bar No. 0044827
mrichter@slk-law.com
Jason P. Stearns, Esquire
Florida Bar No. 0059550
jstearns@slk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

Attorneys for Plaintiff, Yellow Pages Photos, Inc.

## CERTIFICATION UNDER LOCAL RULE 3.01

Counsel for Yellow Pages Photos, Inc. conferred with counsel for ASEC, but the parties were unable to come to a resolution regarding the issues involved and relief requested in this motion.

/s/ Mindi M. Richter
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send electronic filing to the following attorneys for Defendants: David M. Snyder, Esquire, David M. Snyder, P.A., 1810 South MacDill Avenue, Suite 4, Tampa, Florida 33629-5960; C. Douglas McDonald, Esquire, Carlton Fields, P.A., 4221 W. BoyScout Blvd., Suite 1000, Tampa, Florida 33607.

/s/ Mindi M. Richter
Attorney